#31074-r-MES
**2026 S.D. 25**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

VIVOS XPOINT INVESTMENT
GROUP, LLC,                                          Plaintiff and Appellant,

v.

DANIEL SINDORF,                                      Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT A. ROETZEL
Judge

* * * *

ERIC M. SCHLIMGEN
Spearfish, South Dakota                              Attorney for plaintiff and
                                                     appellant.


MATTHEW HAYS MCCOY
Custer, South Dakota

J. SCOTT JAMES of
Southern Hills Law, PLLC
Custer, South Dakota                                 Attorneys for defendant and
                                                     appellee.

* * * *

ARGUED
MARCH 18, 2026
OPINION FILED **04/22/26**

SALTER, Justice

[¶1.]     Vivos xPoint Investment Group, LLC, (Vivos), appeals from the circuit court's summary judgment order in its eviction action against Daniel Sindorf based upon the court's determination that Vivos' lease agreement with Sindorf was illusory.  We reverse.

## Factual and Procedural History

[¶2.]     Vivos is a California company that has converted decommissioned military bunkers into a survivalist community outside of Edgemont.  The 575 concrete bunkers were originally built in 1942 to store bombs and other munitions. The bunkers sat empty from 1967 until Vivos bought the property and began advertising them as survival shelters that can be purchased or leased and repurposed in preparation for a catastrophic event.

[¶3.]     Daniel Sindorf signed a 99-year lease with Vivos for a bunker in July 2020.  As required under the written lease agreement, Sindorf paid his "Bunker Structure Rent" with a single upfront payment of $35,000.  Sindorf's bunker, and others like it, are leased as empty, unfinished concrete shells.  Vivos leaves it to its lessees, like Sindorf, to "build out" the bunker into a livable accommodation either by hiring Vivos employees to do the work or by making their own, separate arrangements.

[¶4.]     Within the lease is a provision that incorporates an addendum which sets forth Vivos' community rules and regulations:

> The Vivos xPoint Community Rules and Regulations are
> attached hereto as Addendum "B", and they, and any future
> amendments thereto, are expressly made a part of the Lease

#31074

Agreement, and Bunker Lessee agrees to abide by and comply with all such rules and regulations.

[¶5.] The lease also reserves Vivos' right to "change or modify" the community rules and regulations within Addendum B:

Vivos may change or modify the Vivos xPoint Community Rules and Regulations at any time, subject to providing the Bunker Lessee a minimum of Thirty (30) Days written notice prior to the effective date of any changes or modification.

[¶6.] Addendum B recites that the "Rules and Regulations are established to keep the Vivos xPoint Community safe, secure, peaceful, harmonious, pleasant and comfortable for all Bunker Lessees and their Guests, Vivos staff, employees, associates and management . . . ." Among the rules set out in Addendum B is a requirement that "Bunker Lessees and their Guests should not create or allow any situation to pose a health risk, threat or harm to any other party." In addition, "Bunker Lessees and their guests must refrain from verbal, physical, sexual or visual threats or harassment of fellow Bunker Lessees and their Guests, Vivos xPoint staff, employees, associates and management."

[¶7.] Addendum B also regulates the storage and use of weapons within the Vivos xPoint Community through several specific rules. For instance, "[a]ll weapons, firearms and munitions must be safely and securely stored inside your Bunker, or vehicle and operated lawfully at all times." And, generally, "[n]o firearms or munitions may be discharged within the Community" other than at a designated shooting range.

[¶8.] In November 2021, Vivos modified this latter rule by adding an express prohibition on brandishing weapons. The rule now reads: "No firearms or

munitions may be discharged *or brandished* within the Community, other than in designated and posted shooting area(s), subject to the posted rules and regulations at the shooting range(s)." (Emphasis added.) Sindorf has acknowledged that he received timely notice of this rule change.

[¶9.]     In July 2023, Sindorf was involved in an altercation where he is alleged to have brandished a firearm in the presence of J.R. Rodriguez, a Vivos employee, and Rodriguez's girlfriend, Stephanie Dundas. Though the facts underlying the altercation are disputed and as-yet unresolved, Sindorf asserts that he drew his firearm to protect himself from the couple's three dogs. The dogs were a source of continued tension for Sindorf, and he had lodged several complaints about them being off leash, including a complaint made just three days before this fateful altercation.

[¶10.]     After learning about the incident, Vivos sent Sindorf a notice to quit on January 4, 2024. This notice, however, was rather broad and made no reference to the alleged rule violation for brandishing a firearm. On March 28, 2024, Vivos sent a written notice of termination of tenancy to Sindorf's attorney. This second notice asserted that Sindorf's conduct during the July 2023 altercation violated Addendum B's rule against brandishing a firearm outside of a posted shooting area. Sindorf's attorney acknowledged having received the notice the following day. On April 30, 2024, Vivos served Sindorf with a new notice to quit and vacate the premises.

[¶11.]     Vivos initiated a forcible entry and detainer action against Sindorf to reclaim possession of the bunker on May 20, 2024. In the complaint, Vivos alleges that Sindorf physically left the Vivos xPoint Community on May 6, 2024, but he

secured the bunker with a personal lock and has since refused to return possession of the bunker back to Vivos. Sindorf filed a motion for summary judgment and dismissal, asserting that Vivos cannot evict him for violating the community rules and regulations because Vivos' ability to unilaterally modify the rules rendered them an unenforceable illusory promise.

[¶12.]     Sindorf further asserted that because the lease agreement does not contain a severability clause and because the rules modification provision is a material part of the lease agreement, the entire lease was illusory and therefore void. But, of course, the void-lease theory would naturally mean that Sindorf, himself, lacked a right of immediate possession to the bunker. In an effort to navigate the inevitable effect of his argument, Sindorf advised the circuit court that the question of immediate possession in this action could be resolved solely by concluding that *Vivos* lacked a right to enforce the lease, apparently without regard to Sindorf's own right of possession.

[¶13.]     In a short, written order, the circuit court granted Sindorf's summary judgment motion, stating simply that "the 99-year lease is an illusory contract that [Vivos] can unilaterally modify the terms of at any time with no recourse for [Sindorf]." Vivos appeals the circuit court's order, arguing it erred when it concluded the lease was illusory.[1]

---

1.     Sindorf makes an alternative argument for the first time on appeal that we can affirm the circuit court's order because the bunker premises was uninhabitable in violation of SDCL 43-32-8. This is an entirely new legal theory that was not pled or developed before the circuit court. Nor is the theory, under the limited record before us, so apparently dispositive that we could confidently accept it. Under the circumstances, we decline to review

(continued . . .)

**Analysis and Decision**

[¶14.]     "We review a circuit court's entry of summary judgment under the de novo standard of review." *Zochert v. Protective Life Ins.*, 2018 S.D. 84, ¶ 18, 921 N.W.2d 479, 486 (quoting *Harvieux v. Progressive N. Ins.*, 2018 S.D. 52, ¶ 9, 915 N.W.2d 697, 700). "When conducting a de novo review, we give no deference to the circuit court's decision." *Id.* (citation modified). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Paulsen v. McKennan*, 2025 S.D. 37, ¶ 11, 24 N.W.3d 522, 526 (quoting *Karst v. Shur-Co.*, 2016 S.D. 35, ¶ 15, 878 N.W.2d 604, 612). "Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied." *Coffee Cup Fuel Stops & Convenience Stores, Inc. v. Donnelly*, 1999 S.D. 46, ¶ 17, 592 N.W.2d 924, 926 (quoting *Walther v. KPKA Meadowlands Ltd. P'ship*, 1998 S.D. 78, ¶ 14, 581 N.W.2d 527, 531).

---

(. . . continued)

Sindorf's statutory habitability argument. *See LP6 Claimants, LLC v. S.D. Dep't of Tourism & State Dev.*, 2020 S.D. 38, ¶ 24, 945 N.W.2d 911, 918 ("When an issue is raised for the first time on appeal[,] this Court need not consider it." (citing *Cain v. Fortis Ins.*, 2005 S.D. 39, ¶ 22, 694 N.W.2d 709, 714)).

*Forcible entry and detainer action*

[¶15.]        We begin by noting the incongruity between Sindorf's argument on appeal and the nature of a forcible entry and detainer action.[2]  "The primary concern in [a forcible] detainer action is the question of immediate right to possession."  *Heiser v. Rodway*, 247 N.W.2d 65, 67 (S.D. 1976) (citing *Raich v. Weisman*, 234 N.W. 664, 665 (S.D. 1931)).  "Chapter 21-6 is designed as a speedy remedy to provide possession to the person rightfully entitled to it."  *Id.*  These actions are purposefully "limited in nature" so that "collateral issues not connected with the question of possession do not burden the proceeding."  *VOR, Inc. v. Est. of O'Farrell*, 2025 S.D. 2, ¶ 39, 17 N.W.3d 252, 262 (quoting *LPN Tr. v. Farrar Outdoor Advert., Inc.*, 1996 S.D. 97, ¶ 9, 552 N.W.2d 796, 798).[3]

---

2.        Vivos' complaint refers to both "forcible entry and detainer," but these terms refer to "distinct wrongs, having different factual bases."  21 Am. Jur. Proof of Facts 2d § 1, 567, West (database updated Feb. 2026).  A forcible entry occurs "when a party exercises force or the threat of force to enter upon property in the possession of another, against the will of the party in possession and without authority of law."  *Id.*  Conversely, forcible detainer refers to "an action resulting from a party[] peaceably entering upon land in the possession of another and thereafter forcibly denying such possession to the other party."  *Id.*  Although these distinct wrongs "are often linked in a single statute," *id.*, South Dakota's statute actually distinguishes between the two.  *See* SDCL 21-16-1 ("An action of forcible entry and detainer, *or of detainer only*, is maintainable . . . ." (emphasis added)).  Because Sindorf peaceably entered the leased premises but is now forcibly denying Vivos possession, the current proceedings are more appropriately referred to as simply a forcible detainer action.

3.        In his answer, Sindorf asserted three counterclaims—breach of the lease relating to Rodriguez's dogs, unjust enrichment relating to the prepaid rent, and a request for a declaration that Vivos breached the lease.  However, the circuit court granted Vivos' motion to dismiss Sindorf's counterclaims after concluding that it lacked subject matter jurisdiction to adjudicate them in a detainer action.  Neither party challenges this decision on appeal.

[¶16.]     Given the narrow scope of a detainer action, the sole question before the circuit court was which party had the "immediate right to possession." *Heiser*, 247 N.W.2d at 67. And here, the lease agreement is the sole basis through which Sindorf asserts a right to possess the bunker. If that lease is now void because it is illusory, Sindorf's own claimed right to immediate possession of the property is, ironically, similarly affected. But Vivos has not asked us to dispose of the case on this basis, and we think it more prudent to leave the logical incongruity of Sindorf's argument aside for now and address the merits of Sindorf's illusory promise theory, which is, after all, the issue Vivos raised on appeal.

### *Illusory lease*

[¶17.]     A lease is a contract governed, as all contracts are, by well-settled legal principles. *See Tri-City Assocs., L.P. v. Belmont, Inc.*, 2014 S.D. 23, ¶ 9, 845 N.W.2d 911, 914–15. "The existence of a [valid] contract is a question of law" that we review de novo. *Nelson v. Est. of Campbell*, 2023 S.D. 14, ¶ 28, 987 N.W.2d 675, 685 (quoting *Harvey v. Reg'l Health Network, Inc.*, 2018 S.D. 3, ¶ 55, 906 N.W.2d 382, 398). A valid contract has four essential elements, one of which is consideration.[4] SDCL 53-1-2(4). South Dakota describes consideration in the following way:

> Any benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise.

---

4.     The other three elements are "(1) Parties capable of contracting; (2) Their consent; [and] (3) A lawful object." SDCL 53-1-2. However, none of these elements are implicated here.

SDCL 53-6-1.

[¶18.] "As a general rule, a promise, in order to constitute sufficient consideration to support another promise, must be binding." 17A Am. Jur. 2d *Contracts* § 124, Westlaw (database updated Feb. 2026); *See* 3 *Williston on Contracts* § 7:7, Westlaw (database updated May 2025) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration."). Put another way, illusory promises cannot serve as contractual consideration because they are so indefinite they are unenforceable. 17A Am. Jur. 2d *Contracts* § 125.

[¶19.] "[A] promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance." *Id.* When a "party can unilaterally modify an agreement such that the party could relieve itself of its promises, there is no meaningful mutuality, which renders the agreement illusory and unenforceable." *Id.*; *see also Acklie v. Greater Omaha Packing Co.*, 944 N.W.2d 297, 306 (Neb. 2020) (describing an illusory promise as one "where the promisor retains an unlimited right to decide later the nature or extent of his or her performance . . . or by its terms makes performance optional or entirely discretionary").

[¶20.] Contrary to the circuit court's conclusion, the lease provision reserving Vivos' right to modify and change the community rules and regulations did not render the lease agreement illusory. An illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Illusory contract*, Black's Law Dictionary (12th ed. 2024). Here, the lease agreement is supported by valid consideration.

[¶21.] Sindorf promised to pay Vivos a certain amount of money in exchange for Vivos' promise to lease him a survival bunker. These promises were sufficient to create legally enforceable obligations against each party. *See Lane v. Wahl*, 6 P.3d 621, 624 (Wash. Ct. App. 2000) (rejecting an illusory promise argument and stating that "the lessee promised to do something and to pay certain money in exchange for the lessor's promise to lease the premises" and that "[t]his promise was sufficient to obligate both parties under the lease"); *see generally* 49 Am. Jur. 2d *Landlord and Tenant* § 18, Westlaw (database updated Feb. 2026) (stating that a valid lease has three requirements: "A lease describes the premises, parties, rent and term").

[¶22.] Furthermore, Vivos' ability to modify the community rules and regulations does not render them illusory and unenforceable.[5] "A written contract may expressly provide for modification." 17A Am. Jur. 2d *Contracts* § 498. And here, the parties expressly agreed that Vivos would be able to modify the community rules and regulations subject only to 30 days' written notice before the modifications became enforceable. As such, Sindorf, should have "naturally expect[ed] the possibility of new regulations regarding the enjoyment of his property so as to prevent giving scandal or offense to" other lessees. *Thousand Island Park Ass'n v. Tucker*, 65 N.E. 975, 978 (N.Y. 1903).

---

5. Sindorf's argument on this point relies exclusively on case law addressing arbitration agreements. But these cases are inapposite because the sole consideration for arbitration agreements is the promise to arbitrate. If one party can choose to not arbitrate at any time, then the agreement lacks consideration. But here, the lease agreement is broader and was supported by valid consideration irrespective of the community rules and regulations.

[¶23.] While it is true that the agreed upon provision reserved broad discretion to modify the rules and regulations, Vivos' discretion was *not* unqualified or absolute, as Sindorf contends. "[A]n obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith." 17A Am. Jur. 2d *Contracts* § 125. "A lease containing a provision that the tenant must keep all rules that the landlord from time to time imposes reserves in the landlord the *power to make reasonable rules only*." 49 Am. Jur. 2d *Landlord & Tenant* § 400, Westlaw (database updated Feb. 2026) (emphasis added).

[¶24.] Because the lease agreement entered between Sindorf and Vivos is a valid contract, it also carried with it "an implied covenant of good faith and fair dealing [that] prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (alteration in original) (quoting *Farm Credit Servs. of Am. v. Dougan*, 2005 S.D. 94, ¶ 8, 704 N.W.2d 24, 27). Thus, any modification that Vivos has made or will make to the community rules and regulations needs to be reasonable, made in good faith, enforced in a non-discriminatory manner, and not adopted for the purpose of depriving any tenant of the benefit of their lease or evading the lessor's obligations under the lease.[6]

---

6. Under the Uniform Residential Landlord and Tenant Act (URLTA), a rule or regulation must (1) "promote the convenience, safety, or welfare of the tenants in the premises"; (2) be "reasonably related to the purpose for which it is adopted"; (3) "appl[y] to all tenants"; (4) is not vague in what it prohibits; (5) "is not for the purpose of evading the obligations of the landlord"; and (6) "tenant has notice . . . when it is adopted". 49 Am. Jur. 2d *Landlord & Tenant* § 400. Although South Dakota has not adopted the URLTA or the revised URLTA, these same requirements can be derived from the implied

(continued . . .)

[¶25.]     Such constraints have traditionally been an effective means of restraining a lessor's modification authority.  For instance, in *Thousand Island Park Association v. Tucker*, a community association developed an 800-acre tract and subdivided it into lots that "it leased to individuals . . . for the purpose of erecting cottages thereon."  *Id.* at 975.  Each lease was for a term of 99 years.  *Id.* The leases also included a "condition that the tenant should keep and perform all such conditions or rules and regulations as the landlord should from time to time impose," which the court determined "reserved to the landlord the power to subsequently make new regulations."  *Id.* at 977.

[¶26.]     The New York Court of Appeals, however, recognized that the association's power to promulgate new regulations was not absolute.  *Id.*  Any new regulation established under the association's reserved power had to be "reasonable."  *Id.*  The court analogized the association's authority to make new regulations with a corporation's ability "to modify or repeal by-laws and to enact new ones."  *Id.*  The court recognized that, in each instance, the power to make new regulations or enact new corporate by-laws could not be exercised to "disturb a vested right" or, as it applies here, the benefits of a tenant's bargain.  *Id.*

[¶27.]     Because Vivos' discretion in modifying the community rules and regulations "must be exercised with reasonableness or good faith," 17A Am. Jur. 2d *Contracts* § 125, Vivos' community rules and regulations are not illusory and are therefore enforceable.  And any modifications to the rules and regulations are also

_____

(. . . continued)
covenant of good faith and fair dealing.  Interestingly, Sindorf cites the URLTA but does not note this provision.

enforceable, so long as they are reasonable, made in good faith, equally enforced, and not adopted for the purpose of evading the lessor's obligations under the lease or depriving any tenant of the benefit of their lease.[7]

[¶28.] Sindorf argues that the implied covenant of good faith and fair dealing cannot apply to the parties' lease because it was illusory and, therefore, not a contract at all. But this circular theory simply begs the legal question at issue in this appeal and incorrectly preempts any meaningful analysis under the accepted contract principles set out above.

[¶29.] We reverse the circuit court's order granting summary judgment in Sindorf's favor based on the lease being illusory. We remand the case to the circuit court for further proceedings consistent with this opinion.[8]

[¶30.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and HOFFMAN, Circuit Court Judge, concur.

[¶31.] HOFFMAN, Circuit Court Judge, sitting for GUSINSKY, Justice, who deemed himself disqualified and did not participate.

---

7.     A separate provision of the lease agreement provides that it "cannot be changed or modified except by written agreement by the Parties." However, Sindorf has not argued that the provision informs our illusory promise discussion here. This provision also seems better suited to an argument not made on appeal that Vivos breached the agreement, not that the entire agreement lacks consideration.

8.     Sindorf moved for appellate attorney fees under SDCL 15-26A-87.3 and SDCL 21-16-11, the latter of which allows fees in forcible entry and detainer actions. But because Sindorf did not prevail, attorney fees are not authorized, and we deny the motion.